[No. B172083. Second Dist., Div. Seven. Sept. 28, 2005.]

COLLEEN M., Plaintiff and Appellant, v.
FERTILITY AND SURGICAL ASSOCIATES OF THOUSAND OAKS,
Defendant and Respondent.

1468

Counsel

Appellate Associates, Jonathan P. Milberg; and Morton A. Kamzan for Plaintiff and Appellant.

Carroll, Kelly, Trotter, Franzen & McKenna, Michael J. Trotter and Jeffrey T. Bell for Defendant and Respondent.

Opinion

**JOHNSON, J.**—Colleen M. (Colleen) brought an action for invasion of privacy and infliction of emotional distress against Fertility and Surgical Associates of Thousand Oaks (Associates) alleging Associates wrongfully disclosed the contents of her medical records to her ex-fiancé and to the attorney representing him in a separate action. The trial court granted Associates' motion for summary judgment on the grounds the undisputed facts showed Colleen had no reasonable expectation of privacy in her records and their disclosure was authorized under the Confidentiality of Medical Information Act (CMIA), Civil Code sections 56 through 56.37.[1] The court subsequently entered judgment for Associates and Colleen filed a timely appeal. We affirm.

## FACTS AND PROCEEDINGS BELOW

The following facts are undisputed.

Colleen and Ronald O. (Ronald) were engaged for about a year. When their engagement ended they agreed Colleen could make charges on Ronald's credit card. According to Colleen's understanding of the agreement she would

---

[1] All future references are to the Civil Code unless otherwise specified.

not be responsible for payment of the charges she created. Ronald would be fully responsible for the charges in order to offset a debt he owed to Colleen.[2]

Several months after entering into the credit card arrangement Colleen began treatment at Associates. When she became an Associates patient Colleen signed a document entitled "Assignment of Benefits, Authorization and Financial Statement" which, Associates contends, authorized it to release all information about her treatment to anyone.

## The First Disclosure

After Colleen began treatment at Associates she told Ronald she needed to go through a medical procedure which would result in a charge of approximately five to six thousand dollars on his credit card. Colleen did not name or describe the medical procedure to Ronald. When Ronald received his credit card statement he telephoned Associates to inquire about the charge and the medical treatment Colleen was receiving. A representative of Associates told Ronald that Colleen had had an in vitro fertilization.

## The Second Disclosure

Nearly a year after learning Colleen was undergoing in vitro fertilization and charging the treatment to his credit card Ronald filed a lawsuit against Colleen alleging breach of contract, fraud and other causes of action. The complaint alleged among other things Colleen represented to Ronald she needed to charge $8,700 on his credit card so she could obtain surgery and therapy for a life-threatening blood disorder when in fact the procedure she charged to his card was an in vitro fertilization.

In connection with the arbitration of this lawsuit Ronald's counsel served a subpoena duces tecum on Associates calling for its custodian of records to produce at the office of the arbitrator on the scheduled date of the arbitration "any and all documents and records . . . pertaining to the care, treatment and examination of [Colleen]." There is evidence notice of the request for these records was served by mail on the attorney representing Colleen at the arbitration. That attorney, however, filed a declaration in the present case stating he was "[n]ever aware or made aware of said Notice . . . ." Colleen made no objection to the release of her medical records in connection with Ronald's lawsuit.

---

[2] Colleen testified at her deposition, "[Ronald] owed me money. He agreed to pay me back by making me an authorized user on a credit card of his. He gave me the credit card, and I made charges on the credit card up to the amount that he owed me."

Prior to the date scheduled for the production of Colleen's medical records at the arbitration, Ronald's attorney advised Associates the date for arbitration had been moved back. Associates advised the attorney its custodian of records could not appear on the new date. Pursuant to an agreement between Associates and Ronald's attorney, Associates mailed the attorney Colleen's medical records.

*The Present Litigation*

Colleen brought suit against Associates. In her first and second causes of action Colleen alleged Associates violated her right of privacy by informing Ronald she was undergoing in vitro fertilization and by releasing all of her medical records to Ronald's attorney including information concerning her "personal life, health issues, obstetrical history, gynecological history, HIV status, and information relative to a history of the presence or absence of abortions and miscarriages." In her third and fourth causes of action Colleen alleged Associates' disclosures caused her severe emotional distress.

The trial court granted Associates' motion for summary judgment concluding there were no triable issues of material fact and Associates was entitled to judgment as a matter of law. The court found the disclosures to Ronald and his attorney were authorized by the CMIA and by the consent form Colleen signed when she sought treatment from Associates. The court further concluded these lawful disclosures could not support causes of action for emotional distress.

We affirm the judgment although, as we shall explain, our reasoning differs from the trial court's as to the disclosure of Colleen's medical information to Ronald.

## DISCUSSION

I. *THE TRIAL COURT ERRED IN RULING AS A MATTER OF LAW COLLEEN CONSENTED TO DISCLOSURE OF HER MEDICAL INFORMATION.*

Associates argues Colleen reasonably should have expected when Ronald received his credit card statement he would know she had received treatment at a facility called "Fertility & Surgical Associates" and that Ronald could potentially make an inquiry to Associates from which he would learn she was receiving fertility services to have a child with a new partner.

We agree that when Colleen charged Associates' services on Ronald's credit card she reasonably should have expected Ronald would learn she received treatment at Associates' facility, the treatment had something to do with "fertility" and may or may not have involved a "surgical" procedure. But Colleen's cause of action is not based on a claim Associates revealed to Ronald she received treatment at its facility. Her cause of action is based on Associates' revealing to Ronald the *nature* of the treatment she received—in vitro fertilization. In order to obtain summary judgment Associates had to present evidence which would "*require* a reasonable trier of fact to find any underlying material fact more likely than not—otherwise, [Associates] would not be entitled to judgment *as a matter of law*, but would have to present [its] evidence to a trier of fact. [Fn. omitted.]"[3] We cannot say the mere fact Colleen revealed she was a patient of Associates would *require* a reasonable trier of fact to find it more likely than not Colleen lacked a realistic expectation Associates would keep confidential the *nature* of the medical treatment she received there.

Associates also contends Colleen's lack of a reasonable expectation of privacy in the nature of her treatment is established as a matter of law by the fact she signed a consent form which authorized the unrestricted release of her medical information. This contention too lacks merit.

The form is on Associates' letterhead and states: "Assignment of Benefits, Authorization and Financial Statement. [¶] I hereby authorize payment directly to Fertility & Surgical Associates of California of the surgical and/or medical benefits, if any, otherwise payable to me for the services as described on the attached claim. [¶] I hereby authorize Fertility & Surgical Associates of California to release any information during the course of my examination or treatment. [¶] I realize that I am responsible for payment in full of the charges on my account for services rendered to me by Fertility & Surgical Associates of California. [¶] By signing this agreement, I acknowledge that I have read, understood and agreed to the terms of the above policy in its entirety." The form is signed and dated by Colleen. This form does not constitute a valid authorization for release of medical information because it does not conform to the requirements of section 56.11.

 To protect a patient's right to privacy in her medical records the CMIA prohibits a health care provider from disclosing medical information

---

[3] *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 851 [107 Cal.Rptr.2d 841, 24 P.3d 493].

regarding a patient "without first obtaining an authorization."[4] Section 56.11 sets out the requirements for a valid authorization. It states in relevant part: "An authorization for the release of medical information by a provider of health care . . . shall be valid if it: [¶] (a) Is handwritten by the person who signs it or is in a type face no smaller than 14-point type. [¶] (b) Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization. [¶] . . . [¶] (d) States the specific uses and limitations on the types of medical information to be disclosed. [¶] . . . [¶] (h) States a specific date after which the provider of health care . . . is no longer authorized to disclose the medical information. [¶] (i) Advises the person signing the authorization of the right to receive a copy of the authorization."

Colleen's purported authorization is invalid because it failed to meet the five requirements quoted above. It is in a type face smaller than 14-point type. It is not clearly separated from other language on the form. Rather, it is the second of four paragraphs on the page; each paragraph is in the same point type and the separation between each paragraph is the same. It is not separately executed. Instead there is one signature applicable to all the terms on the form. The form does not state the specific uses and limitations on the types of medical information to be disclosed nor does it contain an expiration date. Rather it professes to authorize Associates to release any or all of Colleen's medical information to anyone at anytime. Finally, the form does not advise Colleen she has the right to receive a copy of the form.

For the reasons stated above, we hold the trial court erred in determining as a matter of law Colleen could not establish a reasonable expectation of privacy in her medical records.

## II. SECTION 56.10, SUBDIVISION (C)(2) IN THE CMIA PERMITTED DISCLOSURE OF COLLEEN'S MEDICAL INFORMATION TO RONALD WITHOUT HER CONSENT.

Although the CMIA generally bans the disclosure of patient medical information without the patient's authorization the statutory scheme provides some broad exceptions. Associates contends two of these exceptions apply to its disclosure of Colleen's medical information to Ronald. Section 56.10, subdivision (c)(2) permits but does not require a health care provider to furnish medical information to a person or entity responsible for the patient's health care services when the information is necessary to allow responsibility

---

[4] Section 56.10, subdivision (a). (There are relevant exceptions to this prohibition which we discuss, *post.*) "Medical information" for purposes of the CMIA is "any individually identifiable information . . . regarding a patient's medical history, mental or physical condition, or treatment." (§ 56.05, subd. (g).)

for payment to be determined and payment made. Section 56.16 permits but does not require a health care provider to furnish general information about the patient's reason for treatment and the general nature of the patient's medical problem.[5]

For the reasons discussed below we conclude the exception for disclosure to a person responsible for the patient's health care costs applies under the undisputed facts in the record before us. Therefore Ronald was entitled to summary judgment based on section 56.10, subdivision (c)(2) even though triable issues of fact exist as to whether exposing the nature of Colleen's medical treatment fell within the exception for disclosure of general patient information under section 56.16.

## A. *Disclosure of General Patient Information. (§ 56.16.)*

Section 56.16 states: "Unless there is a specific written request by the patient to the contrary, nothing in [the CMIA] shall be construed to prevent a provider, upon an inquiry concerning a specific patient, from releasing at its discretion any of the following information: the patient's name, address, age, and sex; a general description of the reason for treatment (whether an injury, a burn, poisoning, or some unrelated condition); the general nature of the injury, burn, poisoning, or other condition; the general condition of the patient; and any information that is not medical information as defined in subdivision (c) of Section 56.05."[6]

There are three aspects to the disclosure of information under section 56.16.

■ First, the statute does not apply if the patient has signed a "specific written request" that information not be disclosed. (§ 56.16) In this case Associates produced a declaration stating no evidence of such a written or oral request existed in Colleen's file. Colleen produced no evidence she ever made such a request.

■ Second, the provider may release any information "that is not medical information." (§ 56.16) This provision is not an issue because the information

---

[5] Both parties assume the disclosure provisions of the CMIA may provide a complete defense to a cause of action alleging violation of the constitutional right to privacy, not just to a cause of action alleging violation of the CMIA itself. (See § 56.35.) There are cases suggesting this assumption may be incorrect. (*Garrett v. Young* (2003) 109 Cal.App.4th 1393, 1410 [1 Cal.Rptr.3d 134]; and see *Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 42 [32 Cal.Rptr.2d 200, 876 P.2d 999].) We do not address this unbriefed issue.

[6] The reference to section 56.05, subdivision (c) is a drafting error. Medical information is defined in section 56.05, subdivision (g). (See fn. 4, *ante*.)

Colleen received in vitro fertilization was clearly "medical information" as defined in section 56.05, subdivision (g).[7]

Third "upon an inquiry concerning a specific patient" a health care provider may "at its discretion" release any of the following information: "the patient's name, address, age, and sex; a general description of the reason for treatment . . . ; the general nature of the injury . . . ; [and] the general condition of the patient[.]" (§ 56.16)

The Legislature intentionally wrote this disclosure provision in broad terms in order not to impose "burdensome paperwork or administrative requirements on medical providers."[8] Nevertheless the providers' disclosure authority has two important limits which we discuss below.

■ The first limit on the health care provider's disclosure of patient information is the duty to exercise discretion. Section 56.16 does not discriminate among potential recipients of patient information. Information can be disclosed to family members, friends, employers, teachers, the media, even perfect strangers. The statute does, however, require a health care provider to exercise "discretion" in its release of information. We interpret the word "discretion" in this context to mean the quality of being discreet, that is exercising prudence, circumspection, tact. Plainly the Legislature did not intend a provider could use section 56.16 to justify releasing to the media the name and address of a 12-year-old girl who received an abortion, was treated for drug addiction or underwent psychotherapy. The duty of a health care provider to exercise discretion in the disclosure of information also implies a duty on the part of the provider to develop standard policies and procedures as to what information will be disclosed to whom, to train its employees in the execution of these policies and procedures and to monitor and enforce employees' compliance with the provider's standards.

■ The second limit on the health care provider's disclosure of patient information is the prohibition against disclosing anything other than "general" information concerning the reason for treatment, the nature of the medical problem and the patient's condition. Only one appellate decision has construed this limitation. In *Garrett v. Young* the defendant physician told the plaintiff's employer the plaintiff was suffering from "itching and stress."[9] Affirming a verdict for the physician the court held as a matter of law the fact a patient is suffering from stress is the kind of general information which can

---

[7] See footnote 4, *ante*.

[8] *Garrett v. Young, supra,* 109 Cal.App.4th at page 1405.

[9] *Garrett v. Young, supra,* 109 Cal.App.4th at page 1399.

be released under section 56.16.[10] The court went on to observe the fact the plaintiff was suffering from a rash and itchiness "might be sufficiently specific to lie outside the section 56.16 exception."[11] The court concluded it was not necessary to decide that question because the evidence demonstrated the plaintiff's rash and itching were visible to her fellow employees and she herself had revealed it to her employer prior to consulting the physician. The court in dicta also observed in some cases "the issue of whether or not a particular piece of information disclosed by a doctor was or was not 'medical information' would be aided by expert opinion."[12]

■ We believe other relevant evidence on the issue of whether the disclosed information was "general" or "specific" would include evidence of the disclosure practices of other health care providers in the same field and recommendations by health care organizations representing providers and consumers. If a patient's reasonable expectation of privacy is to be judged according to "broadly based and widely accepted community norms" and " 'relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens' "[13] it seems fitting a health care provider's invasion of that privacy should be judged by a comparable standard.

Turning to the case before us there are triable issues of fact as to whether Associate's disclosure of Colleen's in vitro fertilization to Ronald fell within the exception of section 56.16.

On the issue of to whom patient information may be released triable issues of fact exist as to whether Associates properly exercised prudence, circumspection and tact in reporting Colleen's in vitro fertilization to her ex-fiancé. Associates produced no evidence as to its policies and practices, if any, in responding to an inquiry concerning a specific patient and how those policies and practices, if they exist, compare to the policies and practices of other providers in the same field and the recommendations of organizations representing such providers.

On the issue of whether the information Associates revealed to Ronald was sufficiently "general" we cannot say as a matter of law the fact a patient has undergone in vitro fertilization is "the type of innocuous information that medical providers can, and often do, reveal to casual inquirers."[14] Associates

---

[10] *Garrett v. Young, supra,* 109 Cal.App.4th at page 1408.

[11] *Garrett v. Young, supra,* 109 Cal.App.4th at page 1409.

[12] *Garrett v. Young, supra,* 109 Cal.App.4th at page 1407.

[13] *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 37 [26 Cal.Rptr.2d 834, 865 P.2d 633].

[14] *Garrett v. Young, supra,* 109 Cal.App.4th at page 1408.

presented no evidence of the practice among health care providers concerning the disclosure of such information. A reasonable layperson could find in vitro fertilization was not "a general description of the reason for treatment" but a specific description of the treatment itself.

### B. *Disclosure to Person or Entity Responsible for Paying for Patient's Health Care Services. (§ 56.10, subd. (c)(2)).*

Section 56.10, subdivision (c)(2) provides medical information "may be disclosed to an insurer, employer, health care service plan, hospital service plan, employee benefit plan, governmental authority, contractor, *or any other person* or entity *responsible for paying for health care services rendered to the patient*, to the extent necessary to allow responsibility for payment to be determined and payment to be made." (Italics added.) We have found no appellate court decisions construing this provision.

■ In our view this exception to the authorization requirement applies to requests for information from insurance companies, self-insured employers and other entities which have a contractual responsibility to pay for the patient's health care services and who are seeking to determine whether the particular claim submitted by the patient is covered under the contract and the amount of benefits payable under the coverage. It was most likely enacted to prevent putting hospitals, doctors and other providers in the awkward position of either insisting their patients execute authorizations for release of confidential information or risk not being paid for their services.[15]

It is a closer question whether this exception also applies to a private person whose credit card is used by an unrelated third party to pay for that party's medical services.

■ We hold under the undisputed facts of this case Ronald qualified as someone "responsible for paying for health care services rendered to" Colleen and was therefore entitled to receive limited information "necessary to allow [his] responsibility for payment to be determined and payment made."

In this case Ronald told Colleen she could charge up to the amount he owed her for the purpose of having a medical procedure which he understood to involve therapy and surgery for a rare blood disorder. Upon receiving his credit card bill and discovering a charge for in vitro fertilization Ronald quite naturally called the health care provider to inquire about the charge. This

---

[15] This interpretation is supported by section 56.37, subdivision (a), which states a health care provider cannot "require a patient, as a condition of receiving health care services, to sign an authorization, release, consent, or waiver that would permit the disclosure of information that otherwise may not be disclosed under Section 56.10 or any other provision of law."

seems to us analogous to an insurance company whose policy covers certain medical procedures, but not in vitro fertilization, inquiring about the medical procedure the provider furnished to its insured. Upon learning the procedure was not something he had agreed to pay for with his credit card Ronald could protest payment with his credit card company or otherwise seek recovery from Colleen just as the insurance company could decline to pay for the medical services in a similar situation.

We therefore conclude Associates succeeded in showing disclosure of Colleen's in vitro fertilization to Ronald was authorized by section 56.10, subdivision (c)(2) and was entitled to summary adjudication on the first cause of action.

### III. *ASSOCIATES IS NOT LIABLE FOR DISCLOSURE OF COLLEEN'S MEDICAL RECORDS TO RONALD'S ATTORNEY BECAUSE DISCLOSURE WAS COMPELLED BY THE CMIA.*

Colleen's second cause of action arises from Associates' disclosure of her medical records to the attorney representing Ronald in his lawsuit against Colleen. Associates maintains it cannot be held liable for release of Colleen's medical records to Ronald's attorney because such disclosure was compelled by section 56.10, subdivision (b)(3), the disclosure is protected by the litigation privilege, Colleen consented to the disclosure and the facts do not show "outrageous" conduct on the part of Associates. We hold section 56.10, subdivision (b)(3) provides a complete defense to the cause of action based on release of the medical records to Ronald's attorney; therefore we need not address Associates' remaining arguments.[16]

Section 56.10, subdivision (b) states a provider of health care "*shall* disclose medical information if the disclosure is compelled . . . [¶] . . . [¶] (3) [b]y a party to a proceeding before a court or administrative agency pursuant to a subpoena, subpoena duces tecum, notice to appear served pursuant to Section 1987 of the Code of Civil Procedure, or any provision authorizing discovery in a proceeding before a court or administrative agency." (Italics added.)

---

[16] At oral argument Colleen's counsel contended Associates released her records before the time elapsed for her to challenge the subpoena and respondent's counsel appeared to concede that point and sought to justify such an early release. The record shows, however, the records were not released until two days after expiration of the time to lodge a challenge to the subpoena.

The undisputed facts show Associates' disclosure of Colleen's medical records to Ronald's attorney fell within this provision of the CMIA.

It is undisputed Associates is a provider of health care, the medical records disclosed by Associates were "medical information," Ronald was a party to a court proceeding (his lawsuit against Colleen) and the records were produced pursuant to his subpoena duces tecum in that court proceeding. The undisputed evidence also shows Ronald served Colleen's attorney by mail with a copy of the subpoena and the notice of the right to object to disclosure of the records as required by Code of Civil Procedure section 1985.3, subdivision (e) and Colleen did not file an objection. This evidence was sufficient to establish a complete defense to the cause of action under section 56.10, subdivision (b)(3).

*Inabnit v. Berkson*, cited by Associates, is directly on point.[17] The plaintiffs in that case sued their psychotherapist for negligence in releasing their medical records to the defendant in a wrongful death action brought by the same plaintiffs. In upholding a summary judgment for the defendant the Court of Appeal reasoned: "[P]laintiffs, through their attorneys, received notice pursuant to [Code of Civil Procedure] section 1985.3 that defendant's records of treatment of plaintiffs were being sought in the wrongful death action and of what they could do to protect against unwarranted disclosure. In this circumstance, plaintiffs' failure to take any action whatsoever to claim the psychotherapist-patient privilege constituted a waiver of the privilege . . . . Such waiver left defendant in the position of being compelled under the provisions of section 56.10, subdivision (b)(3), to disclose his medical records."[18]

Colleen argues the trial court should not have granted summary judgment to Associates because a triable issue of fact exists as to whether her attorney ever received a copy of the subpoena and notice of right to object to disclosure. Although Colleen's attorney testified only that he was "never aware or made aware" of the notice, Colleen maintains for purposes of summary judgment this was sufficient to raise a reasonable inference the notice was never received in his office. We disagree.

The proof of service of the subpoena and notice on Colleen's attorney states the documents were deposited in the United States mail, in a sealed envelope with postage fully prepaid addressed to Colleen's attorney at his

---

[17] *Inabnit v. Berkson* (1988) 199 Cal.App.3d 1230 [245 Cal.Rptr. 525].

[18] *Inabnit v. Berkson, supra,* 199 Cal.App.3d at pages 1238–1239, citation omitted.

office in Encino, California. This declaration created a rebuttable presumption the documents were received at the attorney's office in the ordinary course of mail.[19]

The effect of this presumption is to require the trier of fact to assume the documents were received by Colleen's attorney unless evidence is introduced which would support a contrary finding.[20] The attorney's weasel worded testimony he was never "made aware" of the subpoena and notice of right to object would not support a finding by the trier of fact the documents were not received at the attorney's office. Without at least some evidence of the mail handling and routing procedures in the office the fact the attorney was never aware of the documents does not rebut the presumption they were received.[21]

Colleen relies on our decision in *Susan S. v. Israels*, in which we held a health care provider's release of subpoenaed medical records directly to a criminal defendant's attorney instead of to the court could support an invasion of privacy claim against the provider.[22] *Susan S.*, however, is readily distinguishable from the case now before us. The subpoena duces tecum in a criminal case requires the witness to appear before a judge with the described books, papers or documents or in the alternative to mail the documents under seal to the clerk of the court, not to the subpoenaing party.[23] The procedure is different in a civil case. There the subpoenaing party may direct the witness to make the records available for inspection and copying by the party's attorney at the witness's business address.[24] Judicial review of the documents is not required. Instead, in the case of personal records such as Colleen's medical information, judicial review is made available at the option of the party whose records are subpoenaed through the filing of an objection to the production of the records.[25] As previously noted Colleen did not file an objection.

We therefore conclude no triable issues of fact exist as to Colleen's cause of action against Associates for releasing her medical records to Ronald's attorney and Associates was entitled to summary adjudication on this cause of action as a matter of law.[26]

---

[19] Evidence Code section 641.

[20] Evidence Code section 604.

[21] *Bonzer v. City of Huntington Park* (1993) 20 Cal.App.4th 1474, 1479–1480 [25 Cal.Rptr.2d 278].

[22] *Susan S. v. Israels* (1997) 55 Cal.App.4th 1290 [67 Cal.Rptr.2d 42].

[23] Penal Code section 1327.

[24] Evidence Code section 1560, subdivision (e).

[25] Code of Civil Procedure section 1985.3, subdivision (e).

[26] As to the third and fourth causes of action, we agree with the trial court's determination disclosures authorized under the CMIA cannot support a cause of action for infliction of emotional distress.

## DISPOSITION

The judgment is affirmed. Each party to bear its own costs on appeal.

Perluss, P. J., and Zelon, J., concurred.

A petition for a rehearing was denied October 21, 2005, and appellant's petition for review by the Supreme Court was denied December 21, 2005. Werdegar, J., and Chin, J., were of the opinion that the petition should be granted.